IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

Nos. 14-2386, 14-2387, and 14-2388

MARILYN RAE BASKIN, *et al.*,
Plaintiffs/Appellees,

v.

PENNY BOGAN, in her official capacity as Boone County Clerk, *et al.*,
Defendants/Appellants.

On Appeal from the United States District Court for the
Southern District of Indiana, Nos. 1:14-cv-355-RLY-TAB,
1:14-cv-404-RLY-TAB, and 1:14-cv-406-RLY-MJD
The Honorable Richard L. Young, Chief Judge

## REPLY BRIEF OF APPELLANTS

ROBERT V. CLUTTER
Kirtley, Taylor, Sims, Chadd &
   Minnette, P.C.
117 W. Main Street
Lebanon, IN 46052
(765) 483-8549
bclutter@kirtleytaylorlaw.com
*Counsel for the Boone County Clerk*

THOMAS ALAN HARDIN
Shine & Hardin LLP
2810 Beaver Ave.
Fort Wayne, IN 46807
Tel: (219) 745-1970
Fax: (219) 744-5411
thardin@shineandhardin.com
*Counsel for the Allen County Clerk*

GREGORY F. ZOELLER
Attorney General of Indiana
THOMAS M. FISHER
Solicitor General
Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov
*Counsel for State Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

SUMMARY OF THE ARGUMENT .......................................................... 1

ARGUMENT ................................................................................................ 4

I.      *Windsor* Does Not Dictate the Result in This Case ........................... 4

II.     There Is No Constitutionally Protected Right to Marry a Person of the Same Sex ............................................................................................. 7

III.    Traditional Marriage Advances State Regulatory Objectives Not Implicated by Same-Sex Couples or Other Social Groupings .......................... 9

        A.      Indiana's traditional marriage definition encourages responsible procreation and does not target a protected class................................... 9

        B.      Plaintiffs *still* do not articulate a theory of civil marriage ................... 17

IV.     For the Same Reasons, Indiana May Refuse to Recognize Same-Sex Marriages from Other States ........................................................... 22

CONCLUSION ............................................................................................ 27

CERTIFICATE OF WORD COUNT .......................................................... 28

CERTIFICATE OF SERVICE ...................................................................... 29

# TABLE OF AUTHORITIES

**CASES**

*Agostini v. Felton,*
   521 U.S. 203 (1997) ................................................................ 6

*Baker v. Nelson,*
   409 U.S. 810 (1972) ................................................................ 6

*Baker v. Nelson,*
   191 N.W.2d 185 (Minn. 1971) ............................................... 16

*Bishop v. United States ex rel. Holder,*
   962 F. Supp. 2d 1252 (N.D. Okla. 2014) ...................... 4, 10, 12

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ....................................................... 2, 12, 15

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) .............................................................. 7, 8

*FCC v. Beach Commc'ns, Inc.,*
   508 U.S. 307 (1993) ............................................................... 15

*Haddock v. Haddock,*
   201 U.S. 562 (1906) ............................................................... 25

*In re Parentage of L.B.,*
   89 P.3d 271 (Wash. Ct. App. 2004) ......................................... 9

*Jackson v. Abercrombie,*
   884 F. Supp. 2d 1065 (D. Haw. 2012) .................................... 10

*Johnson v. Robison,*
   415 U.S. 361 (1974) ................................................... 12, 13, 14, 16

*Latta v. Otter,*
   No. 1:13-cv-00482-CWD, 2014 WL 1909999 (D. Idaho May 13, 2014).................. 4

*Lawrence v. Texas,*
   539 U.S. 558 (2003) .................................................... 6, 11, 26

*Lofton v. Sec'y of Dep't of Children & Family Servs.,*
   358 F.3d 804 (11th Cir. 2004) ............................................... 13

CASES [CONT'D]

*Loving v. Virginia,*
    388 U.S. 1 (1967) ........................................................................ 8, 23, 24

*Madewell v. United States,*
    84 F. Supp. 329 (E.D. Tenn. 1949) ................................................ 23

*Mason v. Mason,*
    775 N.E.2d 706 (Ind. Ct. App. 2002) ............................................ 23

*Mass. Bd. of Ret. v. Murgia,*
    427 U.S. 307 (1976) ........................................................................ 15

*Massachusetts v. U.S. Dep't of Health & Human Servs.,*
    682 F.3d 1 (1st Cir. 2012) ................................................................ 6

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) .......................................................................... 7

*McPeek v. McCardle,*
    888 N.E.2d 171 (Ind. 2008) ...................................................... 22, 23

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) .......................................................................... 4

*Plyler v. Doe,*
    457 U.S. 202 (1982) ........................................................................ 11

*Potter v. Murray City,*
    760 F.2d 1065 (10th Cir. 1985) ...................................................... 21

*Robertson v. Baldwin,*
    165 U.S. 275 (1897) ...................................................................... 7, 8

*Roche v. Washington,*
    19 Ind. 53 (1862) ............................................................................ 23

*Romer v. Evans,*
    517 U.S. 620 (1996) .............................................................. 6, 11, 26

*Schroeder v. Hamilton School District,*
    282 F.3d 946 (7th Cir. 2002) ..................................................... 2, 11

*Schuette v. Coalition to Defend Affirmative Action,*
    134 S. Ct. 1623 (2014) ................................................................. 3, 4

CASES [CONT'D]

*Sevcik v. Sandoval,*
    911 F. Supp. 2d 996 (D. Nev. 2012) ..................................................... 10

*Sclamberg v. Sclamberg,*
    41 N.E.2d 801 (Ind. 1942) .................................................................. 23

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973) ........................................................................... 15

*United States v. Windsor,*
    133 S. Ct. 2675 (2013) ................................................................*passim*

*Vance v. Bradley,*
    440 U.S. 93 (1979) ............................................................................. 13

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................................. 7

*Williams v. North Carolina,*
    317 U.S. 287 (1942) ........................................................................... 25

*Windsor v. United States,*
    699 F.3d 169 (2d Cir. 2012) ............................................................... 11

*Wis. Educ. Ass'n Council v. Walker,*
    705 F.3d 640 (7th Cir. 2013) .................................................. 13, 15, 26

STATUTES

Ind. Code § 6-3-4-2(d) ............................................................................ 21

Ind. Code § 6-4.1-3-7 .............................................................................. 22

Ind. Code § 16-36-1-5 ............................................................................. 22

Ind. Code § 22-3-3-18 ............................................................................. 22

Ind. Code § 22-3-3-19 ............................................................................. 22

Ind. Code § 29-3-5-5 ............................................................................... 22

Ind. Code § 31-11-1-1(a) ........................................................................... 3

Ind. Code § 31-11-1-1(b) ...................................................................*passim*

Ind. Code § 31-11-1-2 ............................................................................. 10

**STATUTES [CONT'D]**

Ind. Code § 31-11-1-4 ................................................................................ 10

Ind. Code § 31-11-4-4 ................................................................................ 24

Ind. Code § 31-11-4-14 .............................................................................. 15

Ind. Code § 31-11-8-4 ................................................................................ 10

Ind. Code § 31-11-8-6 ................................................................................ 24

Ind. Code § 32-17-3-1 ................................................................................ 22

Ind. Code § 34-23-1-1 ................................................................................ 22

Ind. Code § 34-46-3-1(4) ............................................................................ 21

**OTHER AUTHORITIES**

*Age and Fertility: A Guide for Patients Revised 2012*, American Society for
    Reproductive Medicine 5, https://www.asrm.org/uploadedFiles/ASRM_
    Content/Resources/Patient_Resources/Fact_Sheets_and_Info_Booklets/
    agefertility.pdf (last visited Aug. 8, 2014) ............................................ 18

Harvey M. Applebaum, *Miscegenation Statutes: A Constitutional and Social
    Problem*, 53 Geo. L.J. 49 (1964) ............................................................. 16

Richard A. Posner, *Should There Be Homosexual Marriage? And If So, Who
    Should Decide?*, 95 Mich. L. Rev. 1578 (1997) ........................................ 9

Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage*, 110
    Mich. L. Rev. 1421 (2012) ..................................................................... 25

## SUMMARY OF THE ARGUMENT

The fundamental constitutional right Plaintiffs claim here—whether termed "same-sex marriage" or "the right to marry as applied to persons of the same sex"—does not exist.  As Justice Kennedy's majority opinion in *Windsor* acknowledged, "marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization."  *United States v. Windsor*, 133 S. Ct. 2675, 2689 (2013).  The same never could have been said of anti-miscegenation laws.  And the Court's reference to "role and function" is perhaps equally important.  For Indiana, marriage is a licensing and regulatory scheme with the "role and function" of encouraging the optimal environment (*i.e.*, where both biological parents are present) for raising the children that inevitably result from widespread opposite-sex intercourse.

Plaintiffs contend that changes to marriage laws over the years "belie[] any argument that marriage is static and defined by its historic limitations."  Appellees' Br. 22.  Aside from eliding fundamental differences between legislative changes and the judicial declaration solicited here, this statement confirms Plaintiffs do not view marriage as an *institution* at all—at least not one of any particular fixity or utilitarian government interest.  Plaintiffs instead demand a self-defined entitlement to government approval of any relationship whatever.  If that boundless import prevails as a matter of constitutional law, marriage loses all meaning and must accommodate every demand for recognition by every social grouping.

In terms of equal treatment, Indiana's traditional marriage definition draws no classifications of any suspect or quasi-suspect classes. The district court agreed it draws no distinction based on sex. Short App. 25. Nor does it facially classify based on sexual orientation, as it applies equally to same-sex heterosexual platonic friends who might benefit from marriage status (to raise a child or merely combine resources). Besides, as this Court has previously held in *Schroeder v. Hamilton School District*, 282 F.3d 946, 953-54 (7th Cir. 2002), homosexuals do not constitute a specially protected class; that status is reserved for the "politically powerless in the sense that they have no ability to attract the attention of the lawmakers." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (1985). Nor is sexual orientation an "immutable" characteristic in this context, where, to the extent it matters at all, it relates to the government's regulatory purposes.

Accordingly, for both due process and equal protection analyses, Indiana's marriage definition is valid if rationally related to a legitimate government purpose. It advances the *compelling* state need to encourage potentially procreative couples to stay together for the sake of raising children that may result from their sexual intercourse. Same-sex couples do not implicate that interest, so the State need not regulate them.

Plaintiffs protest the law's supposed overbreadth, but never dispute that rational-basis doctrine permits imprecise fit. By affording marriage to opposite-sex couples, Indiana advances its interest in responsible procreation, regardless of other vagaries in the law, and that is all that matters.

Nor does the legislature's decision not to recognize same-sex marriages licensed elsewhere pose a problem. There is no due process right to have a license issued in one State—whether for professional, weapons, driving, or marriage purposes—treated as valid by government and courts in another. A constitutional theory in contravention of that baseline principle would effectively require Indiana to surrender marriage policy to the most creative States. Yet the Supreme Court has specifically observed that "[b]y history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the *separate* States." *Windsor*, 133 S. Ct. at 2689-90 (emphasis added).

Section 31-11-1-1(b) furthers Indiana's interest in responsible procreation by protecting and preserving its traditional marriage definition. No "evidence" of animus disturbs the legitimacy of that purpose. The timing of enactment cannot poison the only definition of marriage that society has ever known, or the fundamental reasons underlying that definition. The Supreme Court has deployed its animus backsword only against novel laws that permit no alternative explanation. Here, the State's longtime rationale for marriage and its desire to protect that rationale and the accompanying definition of marriage explain both Section 31-11-1-1(a) and 31-11-1-1(b).

In *Schuette v. Coalition to Defend Affirmative Action*, 134 S. Ct. 1623, 1637 (2014), the Court, per Justice Kennedy, reaffirmed States' wide berth to "adopt a policy on a difficult subject." For a court to deem controversial questions "too sensitive or complex to be within the grasp of the electorate . . . would be an

unprecedented restriction on the exercise of a fundamental right held not just by one person but by all in common . . . to act through a lawful electoral process." *Id.* at 1636-37. This case deals with the only understanding of marriage that has prevailed throughout Western Civilization until now. Ordering mandatory abandonment of that understanding would be the nadir of judicial respect for a State's citizens to decide a critically important and divisive issue for themselves.

## ARGUMENT

### I. *Windsor* Does Not Dictate the Result in This Case

The Court in *United States v. Windsor*, 133 S. Ct. 2675, 2696 (2013), expressly instructed that its opinion and holding dictate nothing about traditional state marriage regulation: "This opinion and its holding are confined" to marriages lawfully recognized by a State. Plaintiffs make no attempt to explain how their (or the district court's) use of *Windsor* squares with that instruction.

Furthermore, *Windsor's* logic has no application here, as district court decisions concede when they cite its "tone" and "rhetoric" rather than reasoning. *See Latta v. Otter*, No. 1:13-cv-00482-CWD, 2014 WL 1909999, at *8 (D. Idaho May 13, 2014) (stating that *Windsor* signified a "changed tone with regard to laws that withhold marriage benefits from same-sex couples"); *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1296 (N.D. Okla. 2014) ("[T]his Court knows a rhetorical shift when it sees one."). Lower courts err when they dismiss the contextual foundation for a holding. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 724-25 (2007) (disapproving that key limitations in

*Grutter* "were largely disregarded by the lower courts" in upholding "race-based assignments in elementary and secondary schools").

*Windsor* merely protected from federal meddling one State's abandonment of the traditional understanding of marriage. *See Windsor*, 133 S. Ct. at 2689, 2692. It declared no constitutional mandate that other States do the same. The Court characterized DOMA's negative effects on same-sex couples and their children not with reference to traditional marriage as such, but only with respect to how "DOMA forces same-sex couples to live as married for the purpose of state law but unmarried for the purpose of federal law, thus diminishing the stability and predictability of basic personal relations the State has found it proper to acknowledge and protect." *Id.* at 2694. Indeed, it identified a constitutionally protected liberty interest *only* with reference to "the State's decision to give this class of persons the right to marry," upon which state designation, *not* the Constitution, "conferred . . . a dignity and status of immense import." *Id.* at 2692.

Furthermore, the "extent of the state power and authority over marriage" related directly to Congress's lack of legitimate objective when enacting DOMA. *Id.* at 2691-92. Congress may enact "limited federal laws that regulate the meaning of marriage in order to further federal policy," but DOMA "seeks to injure the very class New York"—a sovereign with principal responsibility for such matters—"seeks to protect." *Id.* at 2690, 2693. Because Congress does not generally legislate domestic relations law, DOMA's "interference with the equal dignity of same-sex marriages, a dignity conferred by the States in the exercise of their sovereign power,

was more than an incidental effect of the federal statute." *Id.* at 2693. This "unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage" signaled that Congress had "no legitimate purpose" of advancing traditional federal policy when enacting DOMA. *Id.* at 2693, 2696.

Here, no "unusual" action arouses constitutional concern. As with New York, Indiana is a sovereign State having primacy over domestic affairs within its borders. Unlike New York, however, Indiana has *not* created a protected designation for same-sex couples, and *Windsor* nowhere suggests that such a designation exists by virtue of the Constitution.

*Windsor* neither invalidates traditional marriage definitions nor overrules *Baker v. Nelson*, 409 U.S. 810 (1972), which rejected Plaintiffs' claims on the merits and which continues to bind lower federal courts. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (warning that lower courts should not conclude that more recent Supreme Court decisions "have, by implication, overruled an earlier precedent[; rather, lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions"); *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 8 (1st Cir. 2012) (holding that *Lawrence v. Texas*, 539 U.S. 558 (2003), and *Romer v. Evans*, 517 U.S. 620 (1996), do not "mandate[] that the Constitution requires states to permit same-sex marriages," contra *Baker*).

## II.    There Is No Constitutionally Protected Right to Marry a Person of the Same Sex

1.    Plaintiffs assert that "the scope of a fundamental right is not defined by the identity of the people who seek to exercise it" but, rather, "by *the attributes of the right itself*—in other words, the nature of the autonomy sought."  Appellees' Br. 20.  Plaintiffs make no attempt, however, to identify the "attributes of the right itself."  They seek no actual "autonomy," but government regulation, and by raw fiat declare a right "to marry a spouse of one's own choosing."  *Id.* at 15.

This broad definition abjures "a careful description of the asserted fundamental liberty interest."  *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotations and citation omitted).  Courts must "'exercise the utmost care whenever . . . asked to break new ground in this field,' . . . lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences" of the court.  *Id.* at 720 (citation omitted).

The Supreme Court's handling of Second Amendment rights illustrates the critical role of examining even textual rights in light of history.  In both *District of Columbia v. Heller*, 554 U.S. 570 (2008) (holding the Second Amendment protects an individual right to keep and bear arms for self-defense), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (plurality opinion) (incorporating that right into due process), the Court undertook extensive historical analyses to determine the contours of the asserted right.  It concluded that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors[.]'"  *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*,

165 U.S. 275, 281 (1897)).  Accordingly, the right does *not* include the right to possess "dangerous and unusual weapons."  *Id.* at 627.  Anglo-American history, not "novel principles," provides the actual content of broadly announced rights.

2.     Plaintiffs make no attempt to justify their novel conception of the right to marry.  They merely declare, "courts have emphasized that the Constitution protects autonomy in personal decisions and specifically the free choice of one's spouse."  Appellees' Br. 14.  But the Court has never suggested that the right to marry includes the right to impose one's own novel understanding of government-regulated marriage on the government itself.

Plaintiffs take a conveniently truncated view of history when, citing *Loving v. Virginia*, 388 U.S. 1 (1967), they argue that "[m]ost states banned marriage between persons of different races for much of this nation's history . . . ."  Appellees' Br. 22.  Anti-miscegenation statutes did not reflect any "traditional assumption that interracial marriages were unnatural," *id.* at 23 (internal quotations and citation omitted); to the contrary, they *contravened* common law and marriage traditions in Western society.    Appellants' Br. 21-22.    *Loving restored* the traditional understanding that the institution of marriage is not defined according to race.

Furthermore, the racially discriminatory classification in *Loving* was "designed to maintain White Supremacy" and thereby implicated the "central meaning" and "clear and central purpose" of the Fourteenth Amendment.  *Loving*, 388 U.S. at 10-12.  Unlike interracial couples in the Jim Crow south, same-sex couples may live how and with whomever they please without government

8

interference.   While anti-miscegenation laws clearly and deliberately targeted individuals based on their race, traditional marriage laws cannot be understood to target homosexuals as such.

## III.   Traditional Marriage Advances State Regulatory Objectives Not Implicated by Same-Sex Couples or Other Social Groupings

### A.   Indiana's traditional marriage definition encourages responsible procreation and does not target a protected class

1.   Plaintiffs say Indiana's traditional marriage definition "directly classifies and prescribes distinct treatment on the basis of sexual orientation." Appellees' Br. 26 (quotation omitted).  This statement is patently false.  Section 31-11-1-1 says *nothing* about sexual orientation.  Section (a) says that "[o]nly a female may marry a male" and "[o]nly a male may marry a female."  Section (b) says that same-sex marriages are void no matter where solemnized.  As the prior opposite-sex marriages of several plaintiffs demonstrate, B1.R. 229, 235, 245, not only does Indiana's marriage definition permit homosexuals to marry, but homosexuals commonly do, in fact, marry members of the opposite sex, while some homosexuals would no doubt wish never to marry at all, even if same-sex marriage were available.  Richard A. Posner, *Should There Be Homosexual Marriage? And If So, Who Should Decide?*, 95 Mich. L. Rev. 1578, 1582 (1997) ("There is no legal barrier to homosexuals' marrying persons of the opposite sex; in this respect there is already perfect formal equality between homosexuals and heterosexuals."); *see also In re Parentage of L.B.*, 89 P.3d 271, 273 (Wash. Ct. App. 2004) (homosexual man married homosexual woman in order to co-parent the child they conceived

biologically), *aff'd in part, rev'd in part on other grounds*, 122 P.3d 161 (Wash. 2005).

Nor are homosexual couples "singled out" by Indiana's marriage laws. Heterosexual girlfriends who merely wish to pool resources, or even raise a child together, cannot obtain the benefits of marriage. A caregiver for a mentally competent but physically invalid friend of the same sex, whose care would benefit from marriage, cannot marry her friend. For that matter, heterosexual couples featuring close kin, minors, and mentally impaired individuals also face marital prohibitions. Ind. Code §§ 31-11-1-2, -4, -8-4. The inability of each of these heterosexual couples to marry under Indiana law shows the traditional marriage definition does not target homosexuals akin to sodomy laws.[1]

Further, as the court observed in *Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1005 (D. Nev. 2012), laws protecting traditional marriage "are not directed toward persons of any particular gender, nor do they affect people of any particular gender disproportionately such that a gender-based animus can reasonably be perceived." *See also, e.g.*, *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1286 (N.D. Okla. 2014); *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1098-99 (D. Haw. 2012) (listing cases).

---

[1] Contrary to Plaintiffs' insinuation, *Windsor* did *not* state that DOMA classified homosexuals as such. The majority opinion is replete with references to "same-sex couples," but references "homosexual couples" only when quoting from DOMA's legislative history. Indeed, the Court expressly cast its gaze more generally, speaking of how DOMA disadvantaged "*all* who enter into same-sex marriages made lawful by the unquestioned authority of the States." *Windsor*, 133 S. Ct. at 2693 (emphasis added).

10

2.    Regardless, sexual orientation is not a class protected by heightened scrutiny. *See, e.g.*, *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 953-54 (7th Cir. 2002) ("[H]omosexuals are not entitled to any heightened protection under the Constitution."). *Romer* expressly applied rational basis scrutiny, while *Lawrence* and *Windsor* implied the same. *Windsor*, 133 S. Ct. at 2696; *Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *Romer v. Evans*, 517 U.S. 620, 631-32 (1996).

Sexual orientation does not meet the factors required to demonstrate a suspect class. Homosexuals are politically powerful out of proportion to their numbers, and suspect classification is meant for groups that have been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982) (citation omitted). Homosexuals as a group have achieved many recent legislative successes, *see* Br. of Concerned Women for America at 9-13 [Doc. No. 58]; they possess the support, or have recently changed the minds, of many prominent political, religious, and corporate entities, *id.* at 14-19, 21-24, 26-28; and they enjoy an upsurge in public support, *id.* at 28.

Furthermore, in support of their assertion that sexual orientation is an "immutable" characteristic, Plaintiffs cite only *Windsor v. United States*, 699 F.3d 169, 184 (2d Cir. 2012), which merely concluded that "sexual orientation is a sufficiently *distinguishing* characteristic to identify the discrete minority class of homosexuals." Appellees' Br. 29 (emphasis added). Regardless, the Court in *Cleburne* cautioned that suspect class status is inappropriate where "individuals in

11

the group affected by a law have distinguishing characteristics *relevant to interests the State has the authority to implement*[.]" *Cleburne*, 473 U.S. at 441-42 (emphasis added). Here, same-sex couples cannot procreate, while the general capacity of opposite-sex couples to procreate through sexual activity—even unintentionally—gives rise to the State's interests in marriage. This relevant distinction belies any claim that homosexuality constitutes a suspect class in this context.

3.     This leaves an overall classification permitting only opposite-sex, majority-age, unrelated, mentally competent couples to obtain marriage licenses. Given all these qualifiers, it should be obvious that Indiana has a rather specific regulatory purpose in mind for civil marriage. That regulatory purpose is to encourage potentially procreative couples, whose procreation the State encourages (*i.e.*, not kin or those incompetent to give consent) to form long-term relationships through which together they will raise the children of their sexual union.

The State's purpose is *not*, as Plaintiffs misstate, simply a formal preference to "ensur[e] that children be raised by two married parents" or "'to reduce children born outside of a marital relationship[.]'" Appellees' Br. 41-42 (quoting *Bishop*, 962 F. Supp. 2d at 1292). The State's objective is far more substantive: to encourage childrearing by both *biological* parents in tandem, a circumstance that can arise only with opposite-sex couples, not same-sex couples.

Under *Johnson v. Robison*, 415 U.S. 361 (1974), which expressly held that government need not extend benefits to classes that do not advance its purposes, the State's explanation for the classification is sufficient. Plaintiffs say, "*Johnson*

12

upheld the constitutionality of a benefits scheme because the line the government drew rationally distinguished between two groups, not simply because (as the State asserts) including one group rationally furthered a government interest." Appellees' Br. 38. This statement is incohesive. The line drawn by the government in *Johnson* rationally distinguished between two groups *precisely because* including one group, but not the other, rationally furthered a government interest. *See Johnson*, 415 U.S. at 382-83. Here, as there, "the two groups [are] differently situated with regard to the government interest at stake," Appellees' Br. 38—there, educational benefits for draftees who served; here, regulation of couples whose sexual relations often produce children. There, as here, the "carrot" was equally attractive to both groups, but both groups did not equally serve the government's objectives.

Plaintiffs protest that "[t]here was no argument in *Johnson* (as the State advances here respecting non-procreative, different-sex couples) that groups other than conscientious objectors were provided benefits even though too [sic] they failed to advance the asserted state interests." *Id.* This is nothing more than an assertion that the State's rationale is overbroad, but Plaintiffs nowhere dispute that rational-basis doctrine permits an imprecise fit between means and ends. *See Vance v. Bradley*, 440 U.S. 93, 108 (1979); *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 822-23 & n.20 (11th Cir. 2004). "All that matters is whether the statute, as written, furthers a legitimate government objective." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013). Here, traditional

marriage advances the State's interests in encouraging biological parents to raise their offspring together, and same-sex marriage does not. That particular opposite-sex couples who marry may not themselves directly advance the State's regulatory interests is irrelevant to the analysis.[2]

Indeed, one might make an "overbreadth" rejoinder to the rationale approved in *Johnson* by noting that, while Congress expressly declared its purpose was in part to "aid[] such persons in attaining the vocational and educational status which they might normally have aspired to and obtained had they not served their country," *Johnson*, 415 U.S. at 376, not all draftee service members may have so aspired, yet *all* were eligible for the benefits, while *no* conscientious objectors were. Such an overbreadth objection would have been just as meaningless there as here.

Plaintiffs contend that equal protection doctrine requires "focus . . . on whether there is a rational connection between the *exclusion* created by the challenged legislation and the [asserted] governmental interests[.]" Appellees' Br. 39. *Johnson* completely contradicts that assertion. *See Johnson*, 415 U.S. at 383 (asking whether "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not"). And Plaintiffs' cases do not support it.

In each case cited in footnote 22 of Plaintiffs' brief, the government had to explain exclusion only because (unlike here) the fundamental interest underlying

---

[2] That said, even opposite-sex couples who cannot or do not procreate advance the State's regulatory objectives by modeling normative behavior for other opposite-sex couples whose sexual relations may produce children. *See* Appellants' Br. 36-37. Additionally, marriage in childless circumstances discourages the partners from engaging in seriatim sexual relations with others that may produce unintended children.

the legislative action (or inaction) applied to *both* the included and excluded groups. In *FCC*, the government's interest in requiring franchises for public cable systems applied equally to all dwellings, so there had to be a reason to exempt those under common ownership. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 309-10 (1993). In *Cleburne*, there was no general restriction against operation of "care and multiple-dwelling facilities," so there had to be a reason to exclude a group home for the "mentally retarded." *See Cleburne*, 473 U.S. at 447-48. In *Murgia*, the city's interest in employing police officers applied equally to every applicant regardless of age, so there had to be a reason to exclude those over 50. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 310-11 (1976) (per curiam). In *Moreno*, the government's interest in providing food stamps applied to every low-income household, so it had to justify excluding households with unrelated persons. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-34 (1973). And in *Walker*, the reason to preclude collective bargaining by public employees applied equally to public safety and general employees, so there had to be a reason to exclude public safety employees from that preclusion. *See Walker*, 705 F.3d at 645-46.[3]

Next, Plaintiffs say that "what must be explained is the law that causes the plaintiffs harm," *id.* at 39, which in their view is not the statute providing for marriage, Indiana Code Section 31-11-4-14, but the definition provided by Section

---

[3] *Walker* also eschewed "speculat[ion]" about legislative "motive" even if "the distinctions between the two classes are 'so disconnected' from a proffered purpose and 'so closely connected' to an illegitimate purpose." *Walker*, 705 F.3d at 653. Indeed, "animus only invalidates a law when no rational basis exists," *id.*, a scenario foreclosed here by the benign existence of traditional marriage for thousands of years.

31-11-1-1. This is a mere formalistic distinction. Even absent a definitional statute, no one would interpret Indiana law as affording marital status to same-sex couples. *See Baker v. Nelson*, 191 N.W.2d 185, 185 (Minn. 1971) ("Petitioners contend, first, that the absence of an express statutory prohibition against same-sex marriages evinces a legislative intent to authorize such marriages. We think, however, that a sensible reading of the statute discloses a contrary intent.").[4]

Whether an "exclusion" of same-sex couples is implicit or explicit does not change the analysis. In *Johnson*, the exclusion of conscientious objectors who were drafted and completed mandatory non-military service from educational benefits available to those draftees who served in the armed forces was implicit, but no less real. And both there and here the class has been "excluded" *for the same reason* it has not been included: extending benefits to the class would not advance the government's objectives. *See Johnson*, 415 U.S. at 382-83.

Ultimately, rational-basis scrutiny requires only a legitimate distinction between two groups related to government interests. The ability of sexual relations between members of the opposite sex to create babies, and the inability of sexual relations between members of the same sex to do the same, suffices to justify distinct regulatory treatment via marriage.

---

[4] This rather straightforward observation, that the term "marriage," without more, has historically (*i.e.*, until the past decade) exclusively connoted an opposite-sex relationship, further distinguishes traditional marriage laws from anti-miscegenation laws. Without statutes outlawing interracial marriages, no one would have inferred that the term "marriage" connoted members of the same race. *See* Harvey M. Applebaum, *Miscegenation Statutes: A Constitutional and Social Problem*, 53 Geo. L.J. 49, 49-50 (1964).

**B.    Plaintiffs *still* do not articulate a theory of civil marriage**

Plaintiffs do not dispute that historically the State's central interest in recognizing marriage has been regulatory.  Rather, they make clear that *their* central interest has to do with something far more amorphous: American culture.  They complain that Indiana's traditional marriage definition "denies them the symbolic imprimatur and dignity that the label 'marriage' uniquely confers," a label that "conveys that a relationship is deep and abiding, and commands instant respect for a relationship."   Appellees' Br. 4.   They speak not of a law with regulatory relevance to gay sex, but of a law that "sends [a] message" they do not like, one that "prevents their children from feeling pride in their family."  *Id.* at 7.

The question Plaintiffs continue to avoid, however, is *why* the State would use marriage to confer a "symbolic imprimatur" or "send a message" at all.  And they avoid it because they have no answer for it.  They challenge the State's responsible procreation rationale for marriage, but as an alternative muster nothing more than a few obvious incidents of marriage: "Marriage confers status and dignity on a relationship and a family, it is a public expression of love and support, and it accords benefits and responsibilities that are found nowhere else." *Id.* at 9.  That this statement includes no mention of *why* the government would bother to confer such benefits and responsibilities is a central failing of Plaintiffs' entire constitutional theory.

1.    With the State's theory, we know what marriage means (recognition and regulation of the preferred mode of begetting and raising children) and have

17

thousands of years of experience to support it and define its limits. Plaintiffs attempt to refute this theory by noting that the State does not "condition" marriage on procreation or require proof of intent or ability to procreate. Appellees' Br. 19. Yet the State hardly needs individualized proof that opposite-sex couples who engage in sexual intercourse tend to procreate. And in terms of having "parenting skills," opposite-sex couples, whose sexual relationships create babies, have *the most critical* parenting "skill" of all: a biological and legal relationship to the child.[5]

Plaintiffs also protest that several features of Indiana law are supposedly "inconsistent" with the responsible procreation rationale. *Id.* at 40-41. But any such statutes would not negate that rationale or render it "arbitrary." Legislatures must balance competing priorities, and not every law must advance all of the same legislative objectives.

Among other things, Plaintiffs question why the State permits adoption if marriage is meant to encourage biological parents to raise their children. The answer is that the structure of family life promoted by traditional marriage does not disparage the suitability of alternative arrangements where non-biological parents have legal responsibility for children. Just because marriage law bestows

---

[5] Plaintiffs insist that marriage among the infertile and elderly confound the State's responsible procreation rationale. But infertility is often unknown until after marriage, and regardless, civil marriage does its regulatory work by deterring seriatim sexual relationships by a fertile member of an infertile couple. The same is true with respect to the elderly, considering that men on average do not experience substantial fertility issues until age 60. *Age and Fertility: A Guide for Patients Revised 2012*, American Society for Reproductive Medicine 5, https://www.asrm.org/uploadedFiles/ASRM_Content/Resources/Patient_Resources/Fact_Sheets_and_Info_Booklets/agefertility.pdf (last visited Aug. 8, 2014). In any event the State's long-established regulatory interest in the inevitable consequences of widespread opposite-sex intercourse remains valid.

recognition on opposite-sex couples—the only couples able to procreate on their own—does not mean that the law must also burden adoptive (or surrogate) parenthood.  The legislature may reasonably understand that, while the traditional family context is the best environment for procreating and raising children, such arrangements do not always work and therefore it is wise to provide and permit other arrangements.[6]

Plaintiffs' objections in this regard carry rather dark implications.  Their argument suggests that, unless the State restricts adoption in the extreme, it has no basis for otherwise preferring, encouraging, and protecting biological parenting over any other child-rearing context.  The entire experience of Western Civilization, not to mention constitutional doctrine, dictates otherwise.  *See* Br. of Helen M. Alvaré at 2, 7-11 [Doc. No. 66].

Plaintiffs also say that encouraging responsible procreation could make sense only if the State also had "[r]estricted the ability of unmarried different-sex couples to procreate."  Appellees' Br. 41.  But surely the State may encourage procreation in a particular context without mandating it (which the Constitution would prohibit anyway).  Similarly, Plaintiffs imply that if the State were serious about responsible procreation, it would prohibit parents from divorcing or even separating.  Indiana's marital dissolution law, like all laws, represents the balance of competing interests, and it is perfectly legitimate for the legislature to encourage procreation in the

---

[6]    In this respect, it is particularly odd for Plaintiffs to imply that Indiana's traditional marriage definition would somehow be *more* constitutional if Indiana were to "[r]estrict[] the ability of same-sex couples married in other jurisdictions to adopt and raise children." Appellees' Br. 41.

marital context while also allowing parents to dissolve the marriage. Indeed, insofar as studies show that children benefit most when raised by their biological parents in *low-conflict* marriages, *see* Br. of Alliance Defending Freedom at 16-17 [Doc. No. 83], the legislature may legitimately have concluded that making divorce available ultimately advances the interests of children with respect to at least some marriages.

Just because Indiana does not go to the regulatory extremes that Plaintiffs urge, that does not preclude the State from offering more measured regulatory incentives and protections to encourage responsible procreation.

2.    Plaintiffs provide no theory as to why the State recognizes and regulates marriages, and no theory as to why the State should care about anyone's sexual relationships. They see the positive cultural outcomes of traditional marriage over the millennia and seek to appropriate those same results for themselves. But there is no reason to believe that a fundamentally redefined (actually, undefined) understanding of marriage would yield a similar product. To the contrary, marriage without definition, meaning, or purpose is likely to convey *no* symbolic meaning whatever.

Furthermore, Plaintiffs' demand for an undefined notion of marriage provides no grounds for precluding similar demands by kin or groups of three or more. If marriage exists only as "symbolic imprimatur," replete with benefits and regulations, having no connection to any particular state policy, there is no reason for the State to refuse it to anyone who asks. Plaintiffs' argument essentially

deprives States of a justification for affording any *limited* set of relationships special status and thereby justifies claims from an infinite variety of groups demanding government recognition.

Perhaps aware that they lack any principled rejoinder to this point, Plaintiffs relegate their response to a footnote where they vaguely allude to a supposed "vast set of interests" the State could assert to defend laws barring plural marriage. Appellees' Br. 24-25 n.16. All they are able to conjure, however, are undefined "issues" concerning "who gets to consent to marry" and how "spousal presumptions should operate in a marriage with more than two people." *Id.* But, as with couples, presumably no one could be dragged into a plural marriage without consent, so no new-and-different "consent" issues arise. Plaintiffs do not identify what "spousal presumptions" might concern the State. If they mean to refer to the spousal presumption of parentage of children born to the marital union, such a presumption would make no more sense with same-sex marriages than it would with plural marriages. In both situations, at least one member of the marital union *cannot* be a biological parent.

Oddly, Plaintiffs cite to *Potter v. Murray City*, 760 F.2d 1065 (10th Cir. 1985), for support on this point. But if a "vast and convoluted network of other laws clearly establishing [a] compelling state interest in and commitment to a system of domestic relations" is enough to safeguard monogamy, *id.* at 1070, it should work equally well for traditional marriage. *See, e.g.*, Ind. Code § 34-46-3-1(4) (testimonial privilege between "[h]usband and wife"); Ind. Code § 6-3-4-2(d) (joint tax filing by

"husband and wife"); Ind. Code § 32-17-3-1 (permitting "an estate by the entireties in the husband and wife"); Ind. Code §§ 22-3-3-18, -19 (husband or wife constitutes "presumptive dependent" entitled to compensation for death of spouse under worker's compensation system); Ind. Code § 6-4.1-3-7 (exemption from inheritance tax); Ind. Code § 16-36-1-5 (right to make health care decisions for an incapacitated spouse); Ind. Code § 29-3-5-5 (preference in being appointed legal guardian for an incapacitated spouse); Ind. Code § 34-23-1-1 (providing a wrongful death cause of action); *see also* Appellants' Br. 15-16.

The prospect of laying the groundwork for constitutionally protected plural marriage is Plaintiffs' Achilles' heel, and their rejection of the State's responsible procreation theory is not an argument for same-sex marriage, but an argument against marriage.

## IV. For the Same Reasons, Indiana May Refuse to Recognize Same-Sex Marriages from Other States

Whether Indiana may refuse to recognize other States' same-sex marriages turns entirely on whether Indiana may refuse to license same-sex marriages itself. As the Indiana Supreme Court explained in *McPeek v. McCardle*, 888 N.E.2d 171 (Ind. 2008), Indiana follows the traditional common law contours of the *lex loci* doctrine, which means that Indiana will not recognize marriages from other States that contravene state public policy. *Id.* at 174 & n.2 (citing Ind. Code § 31-11-1-1(b) as one example). If Indiana's public policy against same-sex marriage is valid, so is its refusal to allow that policy to be overrun by marriages undertaken in other

States.  *See Sclamberg v. Sclamberg*, 41 N.E.2d 801 (Ind. 1942) (treating as void an out-of-jurisdiction marriage that could not have been entered into in Indiana).

Both Plaintiffs and the district court rely on *Mason v. Mason*, 775 N.E.2d 706 (Ind. Ct. App. 2002), for the idea that Indiana recognizes all other out-of-state marriages that contravene state public policy.  Neither comes to grips, however, with the limitation that *Mason* merely gives retrospective effect to a marriage from another jurisdiction and says *nothing* about the prospective recognition Plaintiffs seek here.  This is a critical distinction, as ongoing recognition has far greater implications for state public policy than recognition given solely for the sake of settling the affairs of a doomed relationship.  In any event, *Mason* cannot control over *McPeek*, *Sclamberg*, and *Roche v. Washington*, 19 Ind. 53 (1862).  *See* Appellants' Br. 45.  Federal courts should not elevate one-off state intermediate court decisions over contrary state high court declarations, particularly as sources of broadly stated, but rarely litigated, state common law.

Plaintiffs claim that "there is nothing novel about the principle that a couple has a fundamental right to have their marriage accorded legal recognition by the state in which the couple lives."  Appellees' Br. 15.  Actually, there is, as no case has recognized a "fundamental right" to interstate marriage recognition as such.  With respect to *common law* interstate recognition, Plaintiffs might have a legitimate claim if the marriage they propose were not a novel—indeed, radical—concept born only in the last decade.  Both *Loving* and *Madewell v. United States*, 84 F. Supp. 329 (E.D. Tenn. 1949), concerned traditional marriages, not novel same-sex

marriages, and *Loving* in particular *upheld* the traditional parameters of marriage (which took no account of race).  *See* Appellants' Br. 21-22.

Plaintiffs overdramatize the import of Section 31-11-1-1(b)'s declaration that same-sex marriages are void even if valid where solemnized.  They assert that "[w]hen a state effectively terminates the marriage of a same-sex couple married in another jurisdiction, it intrudes into the realm of private marital, family, and intimate relations specifically protected by the Supreme Court."  Appellees' Br. 16.  But Indiana's laws have no bearing on the validity of out-of-state same-sex marriages where solemnized, so Section 31-11-1-1(b) can be understood as nothing more than a refusal to recognize such marriages in Indiana, not an attempt at extraterritorial invalidation.

What is more, Plaintiffs ignore the significance of Indiana's evasion statute, which separately declares a marriage invalid if undertaken in another State to avoid, among other things, the requirement that marriage license applicants disclose facts (such as same-sex status) that would preclude issuance of the license.  *See* Ind. Code § 31-11-8-6; Ind. Code § 31-11-4-4.  Again, it is hard to see how these plaintiffs, all of whom were Indiana residents when they married in other States, have standing to challenge Section 31-11-1-1(b) when a separate statute renders their marriages invalid in Indiana.  As even a scholar sympathetic to same-sex marriage arguments has recognized, "[w]hen an Indiana couple flies to Boston for the weekend to get married, . . . they have no reasonable expectation from the

outset that Indiana will honor their marriage." Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage*, 110 Mich. L. Rev. 1421, 1433-34 (2012).

Next, Plaintiffs contend that *Windsor*, which struck down a *federal* law that made same-sex marriages recognized by New York unequal, precludes *States* from refusing to recognize out-of-state same-sex marriages. Nowhere does *Windsor* suggest that New York's marriage policies must trump other States' marriage laws. *Windsor* stressed that marriage is "an area that has long been regarded as a virtually exclusive province of the States." *Id.* (citation omitted). A necessary corollary is that one State may not impose its marriage policies on another. *See id.* at 2691 ("Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders." (quoting *Williams v. North Carolina*, 317 U.S. 287, 298 (1942))); *see also id.* (quoting with approval *Haddock v. Haddock*, 201 U.S. 562, 577 (1906), which stated that "it is clear that the power of one state did not extend to affecting the thing situated in another state").

Unlike DOMA, it cannot reasonably be said that Section 31-11-1-1(b) "creat[es] two contradictory marriage regimes *within the same State* . . . ." *Id.* at 2694 (emphasis added). A same-sex couple married in Massachusetts may enjoy all the regulatory benefits and burdens of marriage in *that* State, and Indiana neither enlarges nor diminishes that couple's rights in Massachusetts. By the same token, however, if that couple chooses to live in Indiana, the couple may not use its Massachusetts marriage to compel acceptance and recognition without the approval of Indiana's citizens.

In this regard, Plaintiffs overlook the full import of their unsubstantiated claim that "[t]he constitutionally-guaranteed right to marry would be meaningless if government were free to refuse recognition of a couple's marriage once entered[.]" Appellees' Br. 17.  Unconditional acceptance across state lines would mean that one State could define marriage for *all* States, which is anathema to our system of governance.

Plaintiffs also argue that fatal discriminatory intent underlies Section 31-11-1-1(b), but do not defend the district court's misguided reliance on (1) innocuous statements by a single legislator reported seventeen years ago; (2) tendentious statements by political opposition reported at the same time; and (3) a post-enactment statutory heading bestowed by West Publishing Company.  Short App. 26, 29, 32.  Accordingly, the district court's finding in this regard must be reversed as the clear error that it is.

Instead, Plaintiffs contend only that the timing of Indiana's "re-enactment of its traditional marriage law in 1997" evinces "discriminatory animus," Appellees' Br. 34, implying that Section 31-11-1-1(b) would have been valid if enacted at a time when no prospect of same-sex marriage in other States existed.  They cite no cases supporting this counter-intuitive theory, and case law is to the contrary: "animus only invalidates a law when no rational basis exists." *Walker*, 705 F.3d at 654; *see also Romer*, 517 U.S. at 632 ("[T]he amendment seems inexplicable by anything but animus toward the class it affects"); *Lawrence*, 539 U.S. at 578 ("The Texas statute

furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.").

Here, the State eliminates the possibility of discriminatory animus by providing a straightforward, legitimate rationale for the enactment of Section 31-11-1-1(b): "to make sure Indiana law and policy define the marriages that exist in this State." Appellants' Br. 47-48. Accordingly, if Indiana may regulate marriage as an opposite-sex institution within its borders, it may in aid of that authority refuse to recognize same-sex marriages solemnized in other States.

## CONCLUSION

For the foregoing reasons, Defendants-Appellants respectfully request that this Court REVERSE and VACATE the judgment of the district court.

Respectfully submitted,

Gregory F. Zoeller
Attorney General of Indiana

*s/Robert V. Clutter* (with permission)
Robert V. Clutter
Kirtley, Taylor, Sims, Chadd &
    Minnette, P.C.
117 W. Main Street
Lebanon, IN 46052
(765) 483-8549
bclutter@kirtleytaylorlaw.com
*Counsel for the Boone County Clerk*

*s/Thomas Alan Hardin* (with permission)
Thomas Alan Hardin
Shine & Hardin LLP
2810 Beaver Ave.
Fort Wayne, IN 46807
Tel: (219) 745-1970
Fax: (219) 744-5411
thardin@shineandhardin.com
*Counsel for the Allen County Clerk*

*s/Thomas M. Fisher*
Thomas M. Fisher
Solicitor General
Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Tom.Fisher@atg.in.gov
*Counsel for State Appellants*

27

## CERTIFICATE OF WORD COUNT

I verify that this brief, including footnotes and issues presented, but excluding certificates, contains 6,928 words according to the word-count function of Microsoft Word, the word-processing program used to prepare this brief.


_s/Thomas M. Fisher_
Thomas M. Fisher
Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

**No. 14-2386**

Paul D Castillo
Camilla B. Taylor
Lambda Legal Defense & Education
Fund, Inc.
pcastillo@mail.lambdalegal.org
ctaylor@lambdalegal.org

Brent Phillip Ray
Jordan Heinz
Melanie MacKay
Scott Lerner
Dmitriy Tishyevich
Kirkland & Ellis LLP
brent.ray@kirkland.com
jordan.heinz@kirkland.com
melanie.mackay@kirkland.com
scott.lerner@kirkland.com
dmitriy.tishyevich@kirkland.com

Barbara J. Baird
The Law Office Of Barbara J Baird
bjbaird@bjbairdlaw.com

Robert V. Clutter
Kirtley, Taylor, Sims, Chadd & Minnette,
P.C.
bclutter@kirtleytaylorlaw.com

Darren J. Murphy
Assistant Hamilton County Attorney
dmurphy@ori.net

**No. 14-2387**

Chase Strangio
American Civil Liberties Union
cstrangio@aclu.org

Thomas Alan Hardin
Shine & Hardin LLP
thardin@shineandhardin.com

Kenneth J. Falk
ACLU Of Indiana
kfalk@aclu-in.org

Sean C. Lemieux
Lemieux Law
sean@lemieuxlawoffices.com

**No. 14-2388**

Karen Celestino Horseman, Of Counsel
Austin & Jones, PC
karen@kchorseman.com

William R. Groth
Fillenwarth Dennerline Groth & Towe
LLP
wgroth@fdgtlaborlaw.com

Kathleen M. Sweeney
Sweeney Hayes LLC
ksween@gmail.com

Mark W. Sniderman
Sniderman Nguyen LLP
mark@snlawyers.com

I further certify that on August 11, 2014, I e-mailed courtesy copies of this filing to the following counsel of record in the District Court:

**No. 14-2386**

Nancy Moore Tiller
Nancy Moore Tiller & Associates
nmt@tillerlegal.com

John S. Dull
Law Office of John S. Dull, PC
jsdull@yahoo.com

**No. 14-2388**

Elizabeth A. Knight
Porter County Administrative Center
eknight@porterco.org

*s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Indiana Attorney General
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-6255
Facsimile: (317) 232-7979
Tom.Fisher@atg.in.gov